IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 APR -5 AM 9: 23

U.S. ...
H.D. OF ...

**ENTERED**

APR 5 2001

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NUMBER |
| v. | ) |
| | ) 98-C-2562-S |
| MOUNTAIN METAL COMPANY, *et al.* | ) |
| | ) |
| Defendants. | ) |
| ——————————————— | ) |
| | ) |
| EXIDE CORPORATION and | ) |
| JOHNSON CONTROLS, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) CIVIL ACTION NUMBER |
| | ) |
| | ) 98-C-2886-S |
| v. | ) |
| | ) |
| AARON SCRAP METALS, *et al.*, | ) |
| Defendants. | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs, the United States of America, Exide Corporation and Johnson Controls, Inc.,

bring civil actions against defendants pursuant to the Comprehensive Environmental Response,

Compensation, and Liability Act ("CERCLA"). 42 U.S.C. § 9607. *et. seq.* Only three

defendants remain in this action: 1) Lion Metals, Inc., 2) Madewell & Madewell, Inc., and 3) G.

J. Battery Inc., d/b/a Jowers Battery, Inc. (Trial Tr. at p. 250.) The United States of America

brought its civil action against Madewell and Jowers for recovery of past and future costs

1

810

associated with the environmental clean-up of a site located in Leeds, Alabama. *See* 42 U.S.C. §

9607(a)(4)(A). Exide and Johnson Controls bring a separate action seeking contribution from all

three defendants for past and future clean-up costs at the same site. *See* 42 U.S.C. §

9607(a)(4)(B); 42 U.S.C.A § 9613(f). On February 10, 1999, this Court consolidated the two

actions. (USA Doc. 104.)[1] On August 21 and August 22, 2000, the Court held a non-jury trial

solely relating to the issue of liability. During trial, all of the defendants moved for a directed

verdict and later moved for judgment as a matter of law; the Court denied all of these motions.

(Trial Tr. at pp. 165, 168, 170, 176.) Based on the trial proceedings, the Court finds that: 1)

Jowers is an "arranger" for purposes of CERCLA, 2) Lion Metals and Madewell are not

"arrangers" for purposes of CERCLA, 3) pursuant to the Superfund Recycling Equity Act

("SREA"), 42 U.S.C. §9627, all defendants are entitled to protection from the CERCLA action

filed by the private plaintiffs, and 4) attorneys' fees for defendants, pursuant to the SREA, are

not appropriate under the present circumstances.

## I. FACTS [2]

A.   ILCO and Its History of Non-Compliance With Environmental Laws.

From approximately 1970 through 1992, ILCO (Interstate Lead Company a/k/a Interstate

Industries, Inc.) operated a battery breaker and lead smelting facility in Leeds, Alabama. ILCO

---

[1] Because this opinion involves two separate actions with distinct civil action numbers, this Court will refer to documents from *United States v. Mountain Metal* by citing "USA," followed by the document number. The Court will refer to documents from *Exide v. Aaron Scrap Metals* by citing "Exide," followed by the document number.

[2] Unless otherwise indicated, the facts are taken from the parties' joint stipulation of facts. (USA Doc. 760.)

purchased spent lead-acid batteries, lead plates and other materials from defendants and other

customers throughout the United States.  Glen Krause was the materials buyer for ILCO from

1979 through 1991.  He purchased all of the raw material for the facility.  (Trial Tr. at pp. 39-

40.)   Each of the non-resident defendants knew that their materials were being shipped to the

ILCO site.  (USA Doc. 760 at p. 13, ¶ 95.)  Typically, ILCO picked up the lead-bearing materials

or arranged for pick up by Interstate Trucking company a/k/a ILCO Trucking, Incorporated.

ILCO used the materials it purchased from defendants to produce lead ingots for sale. *United*

*States v. ILCO, Inc.*, 996 F.2d 1126, 1129 (11ᵗʰ Cir. 1993).

ILCO's practices led to widespread contamination of the ILCO site and other non-related

properties.  The contamination was not confined to lead contamination, however.  When lead

plates were shipped, generally no further treatment was needed; ILCO could simply place the

plates into the furnace for smelting.  (Trial Tr. at p. 182.)  On the other hand, ILCO had to

reclaim the lead from spent batteries.  The company cracked open spent lead-acid batteries in

order to remove the lead plates and ILCO typically fed the plates into a furnace which created a

"furnace slag" that contained contaminants. When open, the sulfuric acid inside the batteries

spilled onto the ground.  In an effort to neutralize the sulfuric acid, ILCO mixed the sulfuric acid

with a substance, thereby contaminating the ILCO property with hazardous waste sludge.

Additionally, the battery casings were buried throughout the site.  At some point, government

officials discovered battery casings on at least six satellite sites that were not owned by ILCO.

Not only did ILCO apparently dump casings on the property of others, but the evidence

establishes that ILCO hauled the sludge off its property and dumped it on several of the satellite

properties, including a Gulf/BP gas station and a Church.  ILCO ultimately filed for bankruptcy

protection.

Several entities, including Plaintiffs, recently began clean-up of the ILCO site pursuant to a consent decree. Prior to the bankruptcy and consent decree, ILCO regularly attracted scrutiny from federal, state, and local regulatory agencies. (USA Doc. 760 at p.20, ¶ 170.) Numerous inspections revealed violations throughout ILCO's operations from the late seventies through its closure in March 1992. (*See* USA Doc. 760 at pp. 20-22, ¶¶ 171-84.)

In 1980 local citizens filed complaints about ILCO with the Alabama Department of Environmental Management ("ADEM"). (*Id.* at p. 27, ¶ 224.) In 1984, the EPA determined that ILCO posed an imminent and substantial threat to public health and welfare because of the leaking contaminants. (*Id.* at p. 16, ¶ 135.) From January to March 1984, ILCO's operations were shut down because of permit violations. (*Id.* at p.28, ¶ 232.) In September 1985, EPA listed ILCO as a proposed site for the National Priority List ("NPL"). (*Id.* at p. 25, ¶ 211; Trial Tr. at p. 135; Pls.' Ex. 432.) As early as 1985, the EPA regional office in Atlanta listed ILCO on its hazardous waste management data base ("HWMDS") as a non-compiler. (Trial Tr. at pp. 122-23.) The HWMDS was not available to the public, but members of the public were able to contact the regional EPA office for compliance information regarding companies within the region. (*Id.*) Both the EPA and ADEM shared compliance information. (*Id.* at p. 125.) However, the compliance data base, which started out regionally, was not available to EPA nationally until 1990, when the entire EPA computer system was updated. (*Id.* at p. 137.) As a general rule, the EPA regional offices were more familiar, than the EPA national office, with the compliance status of covered entities. (Trial Tr. at p. 212.)

In June 1986, the EPA actually placed ILCO on the NPL. (*Id.* at p. 17, ¶ 143; Trial Tr. at p. 136; Pls.' Ex. 436.) However, placement on the list does not necessarily indicate non-compliance. (Trial Tr. at pp. 220-23.) Other reasons, such as a company's bankruptcy, may

4

cause a company's name to appear on the NPL list. (*Id.*) By 1987, the EPA and ADEM issued a

joint public notice of their intent to deny ILCO a permit because of deficiencies in ILCO's

application. (USA Doc. 760 at p. 36, ¶ 294.) On May 12, 1988, the *USA Today* reported that

residents of Leeds, Alabama wanted the EPA to remove fifty barrels of lead waste that the EPA

had stored in the City Landfill while cleaning up the ILCO site. (*Id.* at p. 42, ¶ 340.) On May 4,

1989, the *USA Today* reported that six companies in Alabama poured dangerous levels of toxic

waste into waterways; the paper also reported that ILCO was one of the six companies. (*Id.* at p.

44, ¶ 353.) The *American Metal Market* reported, on December 21, 1989, that ILCO was

charged with lead pollution and failure to protect workers. (*Id.* at p. 45, ¶ 368.)

   After signing several consent decrees in late 1989 and early1990, ILCO took efforts to

reduce the facility's environmental violations. While ILCO was apparently never in compliance,

(*see* Tr. Tr. at pp. 113-16, 151), one EPA inspector describes this period from late 1989 through

early 1990 as ILCO's "high mark" for underlined attempted compliance. (Trial Tr. at p. 150, 134-35.) In

December 1990, United States District Court Judge Hancock determined that ILCO had violated

numerous federal, state and local environmental laws. *United States v. ILCO, Inc.*, No. CV-85-

H-823-S, 1990 WL 300298 (N.D. Ala. Dec. 10, 1990). Judge Hancock entered a final order in

October 1991 awarding damages and enjoining ILCO from further violating environmental laws.

*United States v. ILCO, Inc.*, No. CV-85-H-823-S, 1991 WL 319383 (N.D. Ala. Oct. 8, 1991).

Judge Hancock found that ILCO had committed at least sixty-one violations between March 8,

1983 and April 26, 1984. (USA Doc. 760 at p. 22, ¶ 185.) None of the evidence indicates that

ILCO informed any of its suppliers about its environmental citations or violations. (Trial Tr. at

p. 64.) Indeed, Glen Krause, the materials buyer, testified at trial that ILCO actually sent

compliance letters when suppliers requested compliance from suppliers. (Trial Tr. at p. 66; *see*

Jowers Ex. 1.)

B.    Defendant Jowers.

Jowers is located in Winter Garden, Florida. (USA Doc. 760 at p. 67, ¶ 230.)  As such,

Jowers shipped whole spent lead-acid batteries to ILCO in 1990, 1991, and finally in February

1992. (USA Doc. 760 at p. 15, ¶¶ 113-4.)  The parties stipulate that Jowers used a broker to

arrange its sale of materials to ILCO.  (*Id.* at p. 67, ¶ 231.)   The broker's role is unclear because

H. Gerald Jowers, the company's owner, testified that ILCO contacted Jowers on several

occasions in late 1989 about arranging battery sales. (*See* USA Doc. 752, Jowers Dep. at pp.16-

17.)  During one of those telephone conversations, Jowers asked Krause about ILCO's

compliance status. (*Id.*)  Krause told Jowers that ILCO was in compliance and sent a letter to

Jowers confirming ILCO's purported compliance status and reporting an EPA number.  (*Id.* at

pp. 16-17, 50; USA Doc. 751, Jowers Dep Ex. 10.)  Jowers testified that he decided to telephone

ADEM and verify ILCO's compliance status because Jowers was in the midst of ligation relating

to a different site. (USA Doc. 752, Jowers Dep. at pp. 18-19.)  Jowers testified that ADEM

reported ILCO was compliant.  (*Id.*)

Later, close to June 1991, Jowers became concerned about ILCO's compliance status

because a Jowers customer mentioned that ILCO had been cited in a clean air study that showed

problems. (*Id.* at pp. 19-23.)  Jowers contacted ILCO and its president, Diego Maffei, who

assured Jowers that ILCO had been absolved of any wrongdoing. (*Id.*)  On June 1, 1991, Maffei

sent Jowers a Health and Human Services report and three newspaper articles apparently

indicating that local children did not have unsafe lead levels and that the lead levels did not

correlate with the children's exposure to the ILCO site. (*Id.*; USA Doc. 751, Jowers Dep. Ex.

6

11.)  The Court notes that the Health and Human Services report was at least one hundred pages

long.  (*See id*.)  Because of the report's length, Maffei highlighted certain portions for Jowers to

read.  (*Id*.; USA Doc. 752, Jowers Dep. at pp. 52-55.)  The highlighted portions contained the

following information:

> Among 81 studied children the mean blood lead concentration was 6.96 mcg/dl
> with a range of 3 to 16 mcg/dl; 85% of the concentrations were below 10 mcg/dl.
>
> The results of the two multivariate models, interpreted in light of the
> environmental data, do not suggest a consistent effect of ILCO-related variables
> on blood lead values in the studied children.  Area A residents had higher lead
> exposure despite living upwind and, on average, farther from ILCO than area B
> residents.  Moreover, the effect of duration of residence on lead exposure was
> opposite in the two models.

(USA Doc. 751, Jowers Dep. Ex. 11 at pp. 19, 20.)  Upon receipt, Jowers read only the cover of

the report and these highlighted portions.  (USA Doc. 752, Jowers Dep. at pp. 71-4.)

Plaintiffs point out a portion of the study explaining that the EPA had placed ILCO on

the NPL list.  (USA Doc. 752, Jowers Dep. at pp. 53-54; USA Doc. 751, Jowers Dep. Ex. 11 at

p. 7.)  Plaintiffs further highlight the next to the last paragraph found in the first newspaper article

Maffei sent.  (USA Doc. 752, Jowers Dep. p. at 56; USA Doc. 751, Jowers Dep. Ex. 11.)  That

paragraph stated: "The company also is awaiting a decision in a federal court case involving its

disposal of waste-water and lead-bearing slag which environmental agencies consider

hazardous."  (*Id*.)   Jowers testified that he did not read the entire article and, therefore, did not

see the paragraph plaintiffs highlight.  (USA Doc. 752, Jowers Dep. at pp. 56-57.)  Moreover,

the headline for the article was entitled "Leeds firm meets anti-pollution deadline."  (USA Doc.

751, Jowers Dep. Ex. 11.)  The headlines for the other articles were similar: "Children in Leeds

free of unsafe lead levels," "Report on Leeds shows safe lead levels."  (*Id*.)

Jowers testified that he was under the impression that  the EPA would shut ILCO down if

the facility was not in compliance. (USA Doc. 752, Jowers Dep. at p. 23.) He did not understand that the company could continue to operate even if it was in violation of environmental laws. (USA Doc. 752, Jowers Dep. at p. 23.)

While Jowers admits it subscribed to the money edition of *American Metal Market* during the time period the company transacted business with ILCO, (USA Doc. 760 at p. 15, ¶ 115), Jowers denies having seen articles regarding ILCO's troubles. (Doc. 752, Jowers Dep. at p. 24.) Jowers testified that he simply reviewed the magazine for information about lead market prices and prices for batteries. (*Id.*) He was not informed by any source of ILCO's non-compliance. (USA Doc. 752, Jowers Dep. at pp. 22-25.)


C.    Defendant Lion Metals.

Lion Metals, Inc. was first incorporated in 1982. (USA Doc. 760 at p. 54, ¶ 102.) The company is located in New Jersey, from where the company first shipped battery plates (not whole batteries) to ILCO in June 1984 and finally in July 1984. (USA Doc. 760 at p.15, ¶¶ 118-9 & p. 67, ¶ 234.) Lion Metals is a small company with approximately five employees. (*Id.* at p. 15, ¶ 122.) Lion Metals was unaware that ILCO was not in compliance with applicable environmental laws and Lion Metals admits that it made no inquiries into ILCO's compliance status. (*Id.* at p. 15, ¶ 120 & p. 68, ¶ 244; Trial Tr. at p. 167.)


D.    Defendant Madewell.

Madewell is located in Jones, Oklahoma. (USA Doc. 760 at p.15, ¶ 123.) The company reclaims plastic and lead from spent batteries. (Trial Tr. at p. 187.) Madewell first sold battery plates (not whole batteries) to ILCO in 1972 and 1977, at which time Madewell used its own

8

trucks to deliver the battery plates. (USA Doc. 760 at p. 15, ¶¶ 124, 127.)  Madewell's owner,

Melvin Madewell, made a short goodwill visit to the ILCO facility around Christmas in 1972,

during which time the ILCO facility was not in operation because of ongoing construction.

(Trial Tr. at pp.183, 192.)  During his visit, Mr. Madewell did not observe ILCO's processing

procedures.  (Trial Tr. at p. 192.)  The company's final sale of plates to ILCO occurred in

November 1980, at which time Interstate Lead Company picked up the battery plates.  (USA

Doc. 760. at p. 15, ¶¶ 114, 124.)


## II. ANALYSIS

A.      CERCLA Liability.

"To establish a claim under [§ 9607(a)] of CERCLA, a plaintiff must prove:

1. the site in question is a 'facility'...;
2. a release or threatened release of a hazardous substance ... occurred;
3. the release or threatened release ... caused the plaintiff to incur response costs; and
4. the defendant is a responsible party under [§ 9607] of CERCLA."

*Chatham Steel Corp. v. Brown*, 858 F. Supp. 1130, 1137 (N.D. Fla. 1994) (citation omitted).

Prior to trial, this Court determined that Plaintiffs had established the first three elements for

CERCLA liability.  Thus, the only liability issue at trial was whether the defendants were

responsible parties under CERCLA.  While § 9607(a) provides for three categories of

"responsible parties," the only category at issue in the present case is "arranger liability." [3]  *See*

42 U.S.C. § 9607(a)(3).  Arranger liability attaches where the plaintiff can establish that a

---

[3]  Other categories of responsible parties are: "1) the present owners and operators of a facility where hazardous wastes were released or are in danger of being released; 2) the owners or operators of a facility at the time the hazardous wastes were disposed; ... and 4) the person or entity that transported the substances to the facility."  42 U.S.C. § 9607(a)

defendant

> who by contract, agreement, or otherwise <u>arranged for disposal or treatment</u>, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances

42 U.S.C. § 9607(a)(3) (emphasis supplied).  While CERCLA defines "disposal" [4] and "treatment," [5] the statute does not provide a definition for the phrase "arranged for."  *Concrete Sales and Services, Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1336 (11th Cir. 2000) (citation omitted).   However, the Eleventh Circuit has held that "a liberal judicial interpretation of the term [arrange] is required in order that we achieve CERCLA's 'overwhelmingly remedial' statutory scheme." *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir. 1990).  When applying this liberal interpretation of CERCLA, courts must avoid

---

[4] CERCLA defines "disposal" as that term is defined in the Solid Waste Disposal Act ("SWDA"):

> discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 9607(29); 42 U.S.C. § 6903(3).

[5] Likewise, CERCLA relies on the SWDA for its definition of "treatment":

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.

42 U.S.C. § 9607(29); 41 U.S.C. § 6903(34).

10

utilizing a bright line test to determine liability. *South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 406 (11th Cir. 1996). Rather, "courts must focus on all of the facts in a particular case," *id.* at 407, including:

> (1) whether a sale involved the transfer of a "useful" or "waste" product; (2) whether the party intended to dispose of a substance at the time of the transaction; (3) whether the party made the "crucial decision" to place hazardous substances in the hands of a particular facility; (4) whether the party had knowledge of the disposal; and (5) whether the party owned the hazardous substances.

*Blue Bird,* 211 F.3d at 1336-37 (citing *Montalv*o, 84 F.3d at 406-7). "While factors such as a party's knowledge (or lack thereof) of the disposal, ownership of the hazardous substances, and intent are relevant to determining whether there has been an 'arrangement' for disposal they are not necessarily determinative of liability in every case." *Montalvo,* 84 F.3d at 407 (emphasis supplied). Given the facts of the present case, the Court finds that battery seller Jowers "arranged for disposal or treatment" of hazardous wastes within the meaning of CERCLA, while lead plate sellers Lion Metals and Madewell did not "arrange" for disposal or treatment.

First, the Court finds that the spent lead-acid batteries Jowers sold are not "useful" products. The present case is almost identical to *Chatham Steel v. Brown*, where the court held that spent lead acid batteries are not "useful" products for purposes of CERCLA. 858 F. Supp. 1130. In *Chatham Steel*, the defendants sold spent lead-acid batteries to a company that recovered the lead from the batteries. 858 F. Supp. at 1134. Defendants in *Chatham* argued that they were not subject to "arranger liability" under CERCLA because they sold a valuable commodity with the intent to make a profit. *Id.* at 1138. Therefore, argued defendants, they could not have intended to dispose of the hazardous wastes.

Rejecting this argument, the *Chatham* court reasoned

11

[w]hen a party sells a product incidentally containing a hazardous substance but having value as being useful for the purpose for which it was manufactured, then the transaction is less likely to be an "arrangement" to dispose of a hazardous substance. In these cases, the party receiving the product will use the product in the manner for which it was manufactured. On the other hand, if a product has no value for the purpose for which it was manufactured and it contains a hazardous substance, then it is more likely the sale is an "arrangement" to dispose of the substance.

In the case sub justice, [sic] the products at issue were spent lead acid batteries. Contrary to the claims of some defendants, the record does not indicate the batteries [that the smelting company] purchased from Defendants were capable of being used as batteries--i.e., they could supply electric current. Rather, the batteries only had value because of the lead they contained. Instead of dealing in a "useful" product, Defendants essentially trafficked in a hazardous substance. This is precisely the type of transaction CERCLA covers.

....

Once the batteries could no longer function as batteries ... they became a waste product. Though the spent batteries still had residual value, this value depended on the lead within the batteries.

Moreover, for anyone to realize this value, the batteries had to be broken open and the lead groups recovered. The process of breaking open the batteries, recovering the lead groups, washing the lead, and disposing of the acid and battery casings amounted to "treatment" of a hazardous substance as defined by CERCLA.

*Chatham*, 858 F. Supp. at 1140-41 (emphasis supplied) (citations and footnotes omitted).

Not only did Jowers sell a product that was not useful, Jowers made the "crucial decision" to place the batteries in the hands of a particular facility that would break open the batteries, recover the lead, wash the lead and dispose of various components in the battery. Accordingly, Jowers arranged for disposal or treatment of the batteries as contemplated under CERCLA.

In contrast, Lion Metals and Madewell sold "useful products," that ILCO did not have to break open, thereby avoiding creation of the waste problem batteries generally create. *See*

12

*Douglass County, Neb. v. Gould, Inc.*, 871 F. Supp. 1242 (D. Neb. 1994); *RSR Corp. v. Avanti Dev., Inc.*, 68 F. Supp.2d 1037, 1045-49 (S.D. Ind. 1999). While the batteries themselves were no longer useful for their original intended purpose, the lead plates were in a form that allowed ILO to place them directly in the furnace for smelting. As such, they constituted a "complete useful product," *Douglass County*, 871 F. Supp. at 1245, or raw material ready for processing, rather than disposal. As the Eleventh Circuit has recognized, "[i]f a party merely sells a product, without additional evidence that the transaction includes an 'arrangement' for ultimate disposal of a hazardous substance, CERCLA liability would not be imposed." *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir. 1990). While the testimony at trial indicated that a certain level of residual acid sometimes remained on the plates by necessity, (Trial Tr. at pp.189-90), selling a useful, albeit hazardous substance, "to serve a particular purpose" does not alone create arranger liability. *Douglass County*, 871 F. Supp. at 1245 (citing *AM Int'l., Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir. 1993)).

Contrary to the plaintiffs' argument, *United States v. ILCO, Inc.*, 996 F.2d 1126 (11th Cir. 1993) (hereinafter *ILCO III*), does not necessitate a finding of liability against lead plate sellers, such as Lion Metals and Madewell. As described above, in October 1991 Judge Hancock entered final judgment against ILCO for its environmental violations and enjoined *ILCO* from continuing its polluting practices. *United States v. ILCO*, No. CV-85-H-823-S, 1991 WL 319383 (N.D. Ala., Oct. 8, 1991) (hereinafter *ILCO II*.) As a part of his final judgment, Judge Hancock found that the "lead battery plates and groups generated at <u>or brought to the facility</u>" did not fall under the definition of "hazardous waste." *ILCO II*, 1991 WL 319383, at * 2 (emphasis supplied). The Eleventh Circuit reversed Judge Hancock and held that lead plates and groups constitute "hazardous waste" and, therefore, recycling activities relating to the plates and

groups are subject to regulation under the Resource Conservation and Recovery Act ("RCRA"). *ILCO III*, 996 F.2d at 1130. In reaching this holding, the Eleventh Circuit relied in part on the EPA's administrative regulations promulgated under the RCRA. *See ILCO III*, 996 F.2d at 1130-32.

However, neither the EPA regulations nor the Eleventh Circuit's holding in *ILCO III* mandate a finding of liability against the lead plate sellers in the present case. First, the Eleventh Circuit characterized the issue in *ILCO III* as "whether lead parts, which have been reclaimed from spent car and truck batteries for recycling purposes are exempt from <u>regulation</u> under <u>RCRA</u>." *ILCO III*, 996 F.2d at 1130 (emphasis supplied). Unlike the parties in *ILCO III*, none of the parties in the present case challenge whether lead pates are "exempt from regulation" under the RCRA, or CERCLA for that matter; certainly lead plates are subject to regulation under these statutes. Rather, the issue in the instant case is whether the lead plate sellers are exempt from liability under CERCLA. Even where the product at issue is hazardous waste, exemption under CERCLA depends on factors such as: whether the lead plate sellers intended to dispose of hazardous wastes, whether the sellers made the "crucial decision" to place hazardous substances in the hands of a particular facility, and whether the lead plates constitute "useful products." *See Blue Bird*, 211 F.3d at 1336-37. *ILCO III* did not address the useful product defense. Thus, the focus of the inquiry in *ILCO III* and the present case are not equivalent. *See Douglass County*, 871 F. Supp. at 146 (distinguishing *ILCO III* from *Douglass*, where defendants sold only lead plates and not the battery casings).

The *ILCO III* holding is not controlling in the present case for another reason. While Judge Hancock noted that ILCO had obtained its lead plates from reclamation of batteries <u>and purchase of lead plates</u>, the Eleventh Circuit focused on ILCO's purchase of "batteries" and its

14

later reclamation of the lead plates. *ILCO III*, 996 F.2d at 1129. Not once in the opinion did the

Court discuss ILCO's acquisition of lead plates that were not encased in batteries at the time of

ILCO's purchase. Instead, the Court noted that ILCO cracked open the incoming batteries for

reclamation of the plates and the Court rejected ILCO's argument that the reclaimed plates ILCO

removed from the batteries were raw materials. *ILCO III*, 996 F.2d at 1129, 1132. In cases like

*ILCO III*, the contamination

> resulted from the disposal of worthless battery casings as opposed to the sale of
> valuable lead plates....
>
> ....
>
> [A] distinction can be drawn between a seller of whole spent batteries and
> a seller of reclaimed lead from such batteries. In selling whole spent batteries, the
> seller is merely getting rid of a product which has no use except to reclaim the
> lead inside. *Chesapeake & Potomac Tel. Co. v. Peck Iron & Metal Co.*, 814 F.
> Supp. 1269, 1275 (E.D. Va.1992). In such a case, the sale is actually a disposal.
> As the language above indicates, however, a reclaimed and seller of lead plates
> creates a new and useful product which may be incorporated into the buyer's
> manufacturing process without imposing liability on the seller as an arrangement
> for its disposal. <u>Had Madewell's reclamation site been contaminated, no doubt the
> battery suppliers would have been liable.</u> But that is not the case here. CERCLA
> liability will not attach if a transaction involves the sale of a new useful product
> as opposed to the sale of a substance merely to get rid of it. *Id.*

*Douglass County*, 871 F. Supp. at 1246 (emphasis supplied) (citing *Catellus Dev. Corp. v.*

*United States*, 34 F.3d 748 (9th Cir. 1994) (footnotes omitted)); *accord RSR Corp. v. Avanti Dev.,*

*Inc.*, 68 F. Supp.2d 1037, 1048 (S.D. Ind. 1999) (noting that the seller of the plates had already

reclaimed the lead plates and that the seller's reclamation process was not the process alleged to

have caused the pollution in the case). *See Montalvo,* 84 F.3d at 407 (noting that courts must

determine "arranger" liability by examining "all the facts in a particular case"); *Blue Bird*, 211

F.3d at 1336-37 (noting several relevant factors for determining "arranger" liability, but not

limiting the "arranger" liability analysis to the factors articulated).

Finally, other Courts have found that cases, like *ILCO*, interpreting the regulations under the RCRA are not controlling in CERCLA cases. *See Department of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 99 F. Supp.2d 1123, 1148 (E.D. Cal. 2000) (citing *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1202 (2d Cir.1992); *State of Idaho v. Hanna Mining Co.*, 699 F. Supp. 827, 833 (D. Idaho 1987), *aff'd*, 882 F.2d 392 (9th Cir.1989); *United States v. Metate Asbestos Corp.*, 584 F. Supp. 1143, 1147 (D. Ariz. 1984); *Transportation Leasing Co. v. California*, No. CV 89-7368-WMB(GHKx), 1990 WL 300777 (C.D. Cal. 1990). Accordingly, this Court finds that *ILCO III* does not warrant a finding of liability against plate sellers Lion Metals and Madewell. As such, both defendants are not "arrangers" for purposes of CERCLA, while Jowers, who sold whole batteries, is an "arranger" for purposes of CERCLA.

B.    Superfund Recycling Equity Act Defense.

    1.    **Liability**.

Even if lead plates sellers are "arrangers" under CERCLA, both lead plate sellers and sellers of spent lead acid batteries may avoid CERCLA liability under a newly enacted amendment to CERCLA. On November 29, 1999, then President Clinton signed the Superfund Recycling Equity Act. ("SREA"). 42 U.S.C. § 9627. The impetus behind passage of the SREA was:

> "(1) to promote the reuse and recycling of scrap material in furtherance of the goals of waste minimization and natural resource conservation while protecting human health and the environment,"
>
> "(2) to create greater equity in the statutory treatment of recycled versus virgin materials,"and
>
> "(3) to remove the disincentives and impediments to recycling created as an unintended consequence of the 1980 Superfund liability provisions."

16

Act of Nov. 29, 1999, Pub. L. No.106-113, § 6001, 1999 U.S.C.C.A.N. (113 Stat.) 1501A-598.

With these goal in mind, the SREA provides that persons or entities who "arrange for recycling of recyclable material shall not" be subject to arranger liability under CERCLA. 42 U.S.C. § 9627(a). Under the SREA, "recyclable material" includes "spent lead-acid" batteries and "scrap metal." 42 U.S.C. § 9627(b). "'[S]crap metal' means bits and pieces of metal parts ... or metal pieces that may be combined together with bolts or soldering .. which when worn or superfluous can be recycled, except for scrap metals that the Administrator excludes from this definition by regulation." 42 U.S.C. § 9627(d)(3). Plaintiffs have not directed the Court to, nor has the Court located, any regulations that would exclude lead plates from the definition of "scrap metal" under the SREA. Therefore, this Court concludes that, pursuant to the SREA, recycling of lead plates is a defense to arranger liability under CERCLA. However, the Court's inquiry does not end there. In order to escape arranger liability for recycling spent lead batteries or lead plates defendants must satisfy additional criteria. Before discussing the other criteria under SREA, this Court must first address the retroactivity of the SREA.

a.    Retroactivity.

The SREA provides that its protection from CERCLA arranger liability "shall not affect any concluded judicial or administrative action or any pending judicial action initiated by the United States prior to the enactment of" the SREA. 42 U.S.C. § 9627(i) (emphasis supplied). The United States initiated its present action against ILCO on October 8, 1998, and the private plaintiffs initiated their action against ILCO on the November 18, 1998. Therefore, all plaintiffs initiated their lawsuits prior to enactment of the SREA in 1999. Accordingly, this Court must determine what effect, if any, the SREA has on the current pending actions.

17

Several other courts have examined the plain language of the SREA, as well as the statute's legislation history, in an effort to determine the appropriateness of retroactively applying the SREA to actions pending at the time of the statute's enactment. *See, e.g., Department of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 99 F. Supp.2d 1123, 1127-54 (E.D. Cal. 2000); *RSR Corp. v. Avanti Dev., Inc.*, No. IP 95-1359-C M/S, 2000 WL 1449859 (S.D. Ind. 2000); *Morton Int'l., Inc. v. A. E. Staley Mfg. Co.*, 106 F. Supp.2d 737, 749-760 (D.N.J. 2000); *Gould, Inc. v. A&M Battery & Tire Serv.*, 232 F.3d 162, 169-70 (3rd Cir. 2000). The Court in the instant case sees no reason to rehash the analysis found in these cases. Instead, this Court simply finds that the SREA's substantive provisions have retroactive effect, consistent with the Supreme Court's retroactivity standard established in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). Even applying the statute retroactively, the action filed by the United States is still viable because the SREA does not apply to "any pending judicial action initiated by the United States prior to the enactment of" the statute. *See* 42 U.S.C. § 9627(i).

However, the statute's retroactivity means the action by the private plaintiffs is not viable, assuming the defendants can meet the SREA criteria. The Court rejects the argument by the private plaintiffs that consolidation of their private party action with the action of the United States means the private plaintiffs may benefit from the protection afforded to the United States under the statute. The statute does not allow recovery for a separate and independent private party action simply because that private action is consolidated with an action filed by the United States. This present situation is not like *United States v. Atlas Lederer Co.*, 97 F. Supp.2d 830 (S.D. Ohio 2000), where the United States sued certain defendants under CERCLA and the defendant companies filed cross-claims and third-party claims against other companies for contribution. In that case, unlike the present case, the private party claims were asserted in the

18

same "action" as the action filed by the United States. *See id.*

        b.      <u>Lion Metals & Madewell (lead plate sellers)</u>.

      Sellers of lead-plates or scrap metal who seek to avoid arranger liability under CERCLA

must "demonstrate by a preponderance of the evidence that at the time of the transaction":

    1.      the seller "did not melt the scrap metal prior to the transaction," and

    2.      the seller "was in compliance with any applicable regulations or standards
           regarding the storage, transport, management, or other activities associated with
           the recycling of scrap metal that the Administrator promulgates under the Solid
           Waste Disposal Act subsequent to the enactment of this section and with regard to
           transactions occurring after the effective date of such regulations or standards."

42 U.S.C. § 9627(d). Both Lion Metals and Madewell meet these requirements of SREA's

subsection d. The parties have stipulated that Lion Metals "has never had any facility at which

any batteries were collected, stored or broken to recover scrap metals." (USA Doc. 760 at p. 54,

¶ 10.) Thus, Lion Metals has established that it "did not melt the scrap metal prior to the [sales]

transaction" involving ILCO. *See* 42 U.S.C. § 9627(d)(1). Next, the parties stipulate that Lion

Metals met requirement two: Lion Metals "was in compliance with any applicable federal

environmental regulations or standards regarding the storage, transport, management or other

activities associated with the recycling of spent lead-acid batteries and battery plates." (USA

Doc. 760 at p. 68, ¶ 242.)

      Like Lion Metals, Madewell also satisfies its burden under subsection d of the SREA.

First, Mr. Madewell testified that he did not melt the lead plates before selling them to ILCO.

(Trial Tr. at pp. 179-80.) Second, Mr. Madewell also testified at trial that his facility was in

compliance with applicable environmental laws. (*Id.* at p 184.) Plaintiffs did not present any

evidence at trial to rebut Mr. Madewell's testimony. Therefore, the Court finds that Madewell

demonstrated that it met the requirements found in subsection d of the SREA.

Finally, the SREA excludes from its protection any entity or person that:

> 1) "had an objectively reasonable basis to believe at the time of the recycling transaction--
>
>> (i) that the recyclable material would not be recycled;
>>
>> (ii) that the recyclable material would be burned as fuel, or for energy recovery or incineration; or
>>
>> (iii) for transactions occurring before 90 days after November 29, 1999, that the consuming facility was not in compliance with a substantive (not procedural or administrative) provision of any Federal, State, or local environmental law or regulation, or compliance order or decree issued pursuant thereto, applicable to the handling, processing, reclamation, or other management activities associated with the recyclable material"
>
> 2) "had reason to believe that hazardous substances had been added to the recyclable material for purposes other than processing for recycling," or
>
> 3) "failed to exercise reasonable care with respect to the management and handling of the recyclable material (including adhering to customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances)."

42 U.S.C. § 9627(f)(1). The SREA explains that

> objectively reasonable basis for belief shall be determined using criteria that include (but are not limited to) the size of the person's business, customary industry practices (including customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances), the price paid in the recycling transaction, and the ability of the person to detect the nature of the consuming facility's operations concerning its handling, processing, reclamation, or other management activities associated with the recyclable material.

42 U.S.C. § 9627(f)(2).

The Court determines that none of the above SREA exclusions apply to Lion Metals or Madewell. At trial Plaintiffs presented evidence solely on the issue of whether defendants had an "objectively reasonable basis to believe at the time of the recycling transaction" that ILCO was not in compliance with applicable environmental laws. *See* 42 U.S.C. § 9627(f)(1) - (2).

However, this Court is not persuaded that either Lion Metals or Madewell had an objectively reasonable basis to believe ILCO was not in compliance with the appropriate laws at the time of the transactions at issue. First, the parties stipulate that Lion Metals did not have actual knowledge of ILCO's non-compliance. Second, Lion Metals had no reason to know of ILCO's non-compliance. Lion Metals was a small company, with approximately five employees, located in New Jersey. Lion Metals arranged its last sale to ILCO in August 1984 before: 1) the EPA proposed placing ILCO on the NPL list in September 1985, and 2) before the EPA placed ILCO on the NPL list in June 1986. Additionally, an EPA representative testified that the EPA regional offices were generally more familiar with the compliance status of covered entities. However, plaintiffs presented no evidence that ILCO was on the EPA regional computer data base as a non-compiler in 1984. Moreover, an EPA representative testified that the regional computer data base information was not available nationally until 1990. Thus, even if ILCO had been listed on the regional data base in 1984, logic suggests that a small New Jersey company would not have realized it had to contact the EPA's regional office, not its national office, to obtain comprehensive information about ILCO. More importantly, the plaintiffs did not present any evidence that Lion Metals had any reason to become concerned about ILCO's compliance status in 1984. These factors taken together indicate that Lion Metals had no "objectively reasonable basis" to believe ILCO was in non-compliance.

Similarly, Madewell had no objective basis upon which to believe that ILCO was in non-

compliance. As with Lion Metals, the parties stipulate that Madewell had no actual knowledge of ILCO's non-compliance. Additionally, Madewell shipped its last order of plates to ILCO in 1980, prior to any EPA public action with regard to ILCO. While Mr. Madewell testified at trial that he visited the ILCO site around the Christmas holiday season in 1972, ILCO was undergoing construction during the visit and Mr. Madewell did not observe ILCO's processing procedures. Given these facts, the Court finds that Madewell had no "objectively reasonable basis" to believe that ILCO was not in compliance.

### c. Jowers (spent lead acid batter sellers).

Sellers of lead acid batteries, like Jowers, who seek to avoid arranger liability under CERCLA must "demonstrate by a preponderance of the evidence that at the time of the transaction":

> (1) the seller "did not recover the valuable components" of the batteries, and
>
> (2) the seller "was in compliance with applicable Federal environmental regulations or standards, and any amendments thereto, regarding the storage, transport, management, or other activities associated with the recycling of spent lead- acid batteries."

42 U.S.C. § 9627(e). Jowers meets both of these requirements. The parties stipulate that Jowers did not recover the valuable components of the batteries and Jowers was in compliance with all applicable environmental laws. (USA Doc. 760 at p. 54, ¶ 100.)

Finally, the Court finds that Jowers is not excluded from the SREA's protection. As with the other defendants, Plaintiffs presented evidence at trial solely on the issue of whether Jowers had an "objectively reasonable basis to believe" that ILCO was not in compliance at the time of its transactions with Jowers.

However, the Court is not persuaded by the plaintiffs' evidence. Mr. Jowers testified that he was not aware of ILCO's non-compliance. Indeed, on more than one occasion, ILCO representatives, including the company's owner, assured Mr. Jowers, via telephone and written correspondence, that ILCO was in compliance. While the report ILCO's owner sent to Mr. Jowers indicated that Jowers was on the NPL list, placement on the list does not necessarily indicate non-compliance. On the other hand, the paragraph found at the end of the newspaper article plaintiffs highlight might have made Jowers suspicious about ILCO's compliance status. However, the Court credits Mr. Jowers's testimony that he did not read the entire article. After all, all three of the articles Maffei sent Jowers had favorable headlines: "Leeds firm meets anti-pollution deadline," "Children in Leeds free of unsafe lead levels," and "Report on Leeds shows safe lead levels." (*See* Doc. 761, Jowers Dep. Ex. 11.) Moreover, the three articles were attached to a report consisting of approximately 100 pages, or more.

Additionally, the Court credits the testimony of Mr. Jowers that he telephoned ADEM for compliance information and was told that ILCO was "complaint, viable and receiving." (USA Doc. 752, Jowers Dep. at pp. 18-19.) While testimony by the regional EPA director indicates that the EPA and ADEM shared information, plaintiffs present no evidence that ADEM maintained a data base with such information, as did the EPA. This Court finds that Mr. Jowers acted reasonably when he contacted the state agency rather than the EPA. Indeed, the EPA's Alabama regional office was located in Atalanta. Certainly, it was easier and more practical for an individual in Florida to pick up the telephone and contact the Alabama state environmental agency, rather than try to determine which EPA office to contact. Given these circumstances, the Court finds that Jowers had no "objectively reasonable basis" to believe that ILCO was not in compliance. Therefore, Jowers does not fall within the exclusion provision of the SREA.

23

2.    **Attorneys' Fees**.

Finally, the SRE provides that CERCLA defendants may seek attorneys' fees if the defendants can avoid arranger liability under the SRE.[6]  42 U.S.C. § 9627(j).  While the statute generally has retroactive effect, this Court finds that defendants are not entitled to fees under the present facts.

First, the attorney fee provision's retroactive effect would result in manifest injustice. *See RSR Corp. v. Avanti Dev., Inc.*, No. IP 95-1359-C M/S, 2000 WL 1449859, at * 4 (S.D. Ind. 2000) ("noting that retroactivity inquiry demands common sense, functional judgment about whether the new law attaches legal consequences to events completed before its enactment") (citing *Martin v. Hadix*, 119 S. Ct. 1998, 2006 (1999)).  The Supreme Court describes the retroactivity analysis as one that "should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Dept. of Toxic Substances v. Interstate Non-Ferrous Corp.*, 99 F. Supp.2d 1123 (E.D. Cal. 2000) (citing *Martin*, 119 S. Ct. at 2006).

Awarding fees in the present case would upset the considerations delineated by the Supreme Court.

> [T]he [present] Court is not convinced that allowing the imposition of statutory attorney fees as a consequence of bringing a contribution action against a person who is now exempt under the SREA would be proper. The plaintiffs made their

---

[6] The attorney fee provision provides:

Any person who commences an action in contribution against a person who is not liable by operation of this section shall be liable to that person for all reasonable costs of defending that action, including all reasonable attorney's and expert witness fees.

42 U.S.C. § 9627(j).

24

> decisions about whom to sue at a time when CERCLA did not allow a prevailing
> party in a contribution action to obtain costs and fees from its opponent.

*RSR Corp.*, 2000 WL 1449859, at * 4.  Further, this Court "cannot conclude that plaintiffs here

could have relied on prior case law to the extent that they would have been forewarned that

possible recyclers would not be contribution candidates and should be penalized with the

fee-shifting provision." *See Morton Int'l., Inc. v. A. E. Staley Mfg. Co.*, 106 F. Supp.2d 737,

758-9 (D.N.J. 2000).

Finally, fees are not appropriate in the present case given the language of the fee shifting

provision, which allows recovery of "reasonable attorney's and expert witness fees." *See* 42

U.S.C. § 9627(j).  Because "there was no notice to the plaintiffs of the fee-shifting provision

before the commencement of [this] action" this Court concludes "that the award of any fees is

not reasonable." *See Morton*, 106 F. Supp.2d at 759 (citation omitted).

### III. CONCLUSION

For the above reasons, this Court finds that: 1) Jowers is an "arranger" for purposes of

CERCLA, 2) Lion Metals and Madewell are not "arrangers" for purposes of CERCLA, 3)

pursuant to the Superfund Recycling Equity Act ("SREA"), 42 U.S.C. §9627, all defendants are

entitled to protection from the CERCLA action filed by the private plaintiffs, and 4) attorneys'

fees under the SREA are not appropriate given the present facts.  By separate orders, the Court

will grant appropriate relief.

Done this _____ day of April 2001

_____
Chief United States District Judge
U. W. Clemon