FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

03 JUN 12 AM 9: 53

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER** |
| **v.** | ) | |
| | ) | **98-C-2562-S** |
| **MOUNTAIN METAL COMPANY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **EXIDE CORPORATION and** | ) | |
| **JOHNSON CONTROLS, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION NUMBER** |
| | ) | |
| | ) | **98-C-2886-S** |
| **v.** | ) | |
| | ) | |
| **AARON SCRAP METALS,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

ENTERED

JUN 1 2 2003

**MEMORANDUM OPINION**
**ON MOTIONS FOR RELIEF FROM DEFAULT JUDGMENTS**

Presently before the Court are two motions asking the Court to relieve two

defendants from default judgments because of insufficient service of process. [1] First,

———————————————

[1] Because the consolidated lawsuits involved herein have two distinct civil action
numbers and some documents have been filed in only one of the cases, the Court will refer to

893

defendant Novick Iron & Metal ("Novick") has filed a "Motion for Relief From Judgment Against Defendant and Motion to Dismiss." (USA Doc. 873.)  Novick's motion relates solely to the private party lawsuit filed by Exide Corporation and Johnson Controls, Incorporated.  Second, defendant Heck's Enterprises, Incorporated ("Heck's") has filed a "Motion to Vacate Default Judgment." (USA Doc. 859.)  As a defendant in both of the above-referenced cases, the Heck's motion relates to both of the consolidated lawsuits.

For the reasons explained below, the Court finds that Plaintiffs did not properly serve Novick and Heck's with the summons and complaint.  Accordingly, the default judgments entered against these defendants by this Court are void.

## I. GENERAL BACKGROUND FACTS RELATING TO BOTH LAWSUITS

The instant litigation stems from environmental contamination that occurred in Leeds, Alabama.  From approximately 1970 through 1992, Interstate Lead Company a/k/a Interstate Industries, Incorporated ("ILCO") operated a battery breaker and lead smelting facility in Leeds.  ILCO purchased spent lead-acid batteries, lead plates and other materials from defendants, and other customers, located throughout the United States.  ILCO's practices led to widespread contamination of the ILCO site, as well as contamination of other non-related properties.  Ultimately, ILCO filed for bankruptcy

---

documents from *United States v. Mountain Metal* (CV-98-C-2562-S) by citing "USA," followed by the document number.  The Court will refer to documents from *Exide v. Aaron Scrap Metals* (CV-98-C-2886-S) by citing "Exide," followed by the document number.

protection.

On October 8, 1998, the United States of America ("USA") initiated the first lawsuit, involved herein, by filing a complaint against nearly fifty defendants, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, *et seq.* In its complaint, the USA sought recovery of past and future costs associated with environmental clean-up of the ILCO site. *See* 42 U.S.C. § 9607(a)(4)(A) - (B); 42 U.S.C. § 9613(f). Approximately six weeks later, the private party plaintiffs, Exide Corporation ("Exide") and Johnson Controls, Incorporated ("Johnson Controls"), also filed suit against nearly fifty defendants seeking similar remedies under CERCLA. Exide and Johnson Controls ("private party plaintiffs"), subsequently amended their complaint to add numerous additional defendants. While many of the defendants named in the USA's suit are the same as those named in the private party lawsuit, some defendants are named in only one of the lawsuits. On February 10, 1999, this Court consolidated the two lawsuits. (USA Doc. 104.)

By the time these lawsuits were ready for trial, only three defendants remained in the litigation, none of whom are involved in the current dispute over service of process. On April 5, 2001, the Court entered its trial "Findings of Fact and Conclusions of Law" with respect to the substantive issues raised under CERCLA. (USA Doc. 810.) Currently, plaintiff Johnson Controls has an appeal pending in the Eleventh Circuit Court of Appeals challenging this Court's substantive rulings. (*See* USA Doc. 866.)

## II. JURISDICTIONAL ISSUES

As an initial matter, in spite of the currently pending appeal, this Court has jurisdiction to hear the present disputes. An appeal only divests a federal trial court of jurisdiction with respect to matters "affecting the questions presented on appeal." *Weaver v. Florida Power & Light Co.*, 172 F.3d 771, 773 (11th Cir. 1999) (citations omitted). Because the substantive CERCLA issues raised in the appeal are unrelated to the current service disputes, this Court has jurisdiction to hear the pending motions over service of process.

## III. NOVICK'S MOTION TO VACATE

### A.    Facts

In June 1999, the private party plaintiffs filed a motion seeking to amend their complaint for the purpose of adding additional defendants, including Novick, a Kansas corporation. (*See* USA Doc. 193.) On June 30, Plaintiffs' counsel sent a letter to attorney J. Michael Lehman informing him of the litigation and the soon to be served amended complaint. (Novick Br. at Ex. 4, Pls.' Ex. B ¶ 3; Novick Br. at Ex. 4, Pls.' Ex. C.) Lehman, who has acted as outside counsel to Novick, never responded to the letter. However, on July 8, 1999, Plaintiffs attempted to serve Novick using a Waiver of Service form sent to Lehman's business office. (Novick Br. at Ex. 4, Pls.' Ex. C.)

When the waiver was not returned, Plaintiffs attempted to serve Novick by personal service in care of "J. Michael Lehman, 962 N. Tyler Rd., Wichita, KS 67212."

(Novick Br. at Ex. 1; Novick Br. at Ex. 2.)  The North Tyler Road address is the address of Lehman's business office.  (Novick Br. at Ex. 3, Lehman Aff. ¶ 2.)  Lehman admits that he was served.  However, in his affidavit, Lehman explains that he was not authorized to accept service on behalf of Novick, he was not an officer or agent of Novick, nor was his law office a business office for Novick.  (Novick Br. at Ex. 3, Lehman Aff. ¶¶ 3-5.)

After Novick failed to answer the complaint, Plaintiffs obtained a default judgment against Novick, on November 19, 1999.  (USA Doc. 315.)  Plaintiffs certified the default judgment on June 19, 2002, in the United States District Court for the District of Kansas, and subsequently obtained a Writ of Execution against Novick, garnishing its funds in the amount of $71,896.00, plus interest.

Several months later, on August 23, 2002, Charlene Kass, who is the daughter of the late Mr. Novick, telephoned Brian G. Friel, one of the attorneys who represented Plaintiffs. [2]  According to Friel, Kass advised him that Novick had not entered an appearance in the litigation, nor had Novick been served.  (Novick Br. at Ex. 7; Novick Br. at Ex. 4, Pls.' Ex. A ¶ 3.)  Friel also claims that Kass informed him that an attorney would contact him soon.  (Novick Br. at Ex. 4, Pls.' Ex. A ¶ 6.)  Nobody contacted Friel and, on September 4, 2002, Novick's bank released funds to Plaintiffs in satisfaction of the default judgment.

---

[2] Friel no longer works for the firm that represents Plaintiffs.

Two days later, on September 6, 2002, Novick filed a "Motion to Quash and Vacate Order of Garnishment" in the Kansas Federal District Court. After a hearing before the Kansas District Court Judge, Novick withdrew its motion without prejudice, made a special appearance before the present Court, and filed the motion that is currently at issue. In its motion, Novick asks this Court to: (1) vacate the default judgment, pursuant to Fed. R. Civ. P. 60(b)(4);[3] (2) find that this Court has no jurisdiction over Novick; (3) dismiss this action as asserted against Novick, pursuant to Fed. R. Civ. P. 12(b)(5);[4] (4) order the garnished funds returned; and (5) award Novick attorneys' fees and costs. (USA Doc. 873.)

## B.    Default Judgments

"[D]efault judgments are disfavored. Courts prefer adjudication on the merits." *Varnes v. Local 91, Glass Bottle Blowers Assoc. of the United States and Canada*, 674 F.2d 1365, 1369 (11th Cir. 1982) (citation omitted). However, if a defendant has not been properly served, the court lacks personal jurisdiction over the defendant. *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990). When the court lacks personal

---

[3]  Federal Rule of Civil Procedure 60(b)(4) provides:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (4) the judgment is void ....

[4]  Federal Rule of Civil Procedure 12(b)(5) allows a party to assert a defense for "insufficiency of service of process."

jurisdiction over the defendant, any judgment entered against that defendant is void. *See Jackson v. FIE Corp.*, 302 F.3d 515, 525 (5th Cir. 2002).

## C.    Service of Process

Pursuant to the Federal Rules of Civil Procedure, a plaintiff may notify a defendant, including a corporation, that an action has commenced and request that the defendant waive service of the summons. Fed. R. Civ. P. 4(d)(2).  When the defendant is a corporation, the plaintiff must send the waiver, complaint and summons to "an officer or managing or general agent (or other agent authorized by appointment or law to receive service or process) ...." Fed. R. Civ. P. 4(d)(2)(A).  After sending the waiver, the plaintiff must allow the corporate defendant a reasonable amount of time in which to return the waiver:  at least thirty days from the date upon which the waiver request was sent. Fed. R. Civ. P. 4 (d)(2)(F).  Once the waiver is returned, a corporate defendant has sixty days, from the date on which the waiver request was sent, to answer the complaint. Fed. R. Civ. P. 4(d)(3).

If the corporate defendant does <u>not</u> return the waiver, the plaintiff may serve the defendant:

(1)      pursuant to the law of the sate in which the district court is located, [5]

---

[5] Alabama law on service of process does not provide any broader rules for personal service or mail service than under the Federal Rules:

Service of process, except by publication ... shall be made as follows:

> (2)    pursuant to the law of the state in which service is effected, [6] or
>
> (3)    by delivering a copy of the summons and complaint to an "officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process."

Fed. R. Civ. P. 4(h)(i); *see* Fed. R. Civ. P. 4(e).

---

> Upon a corporation, either domestic or foreign, by serving the agent authorized by appointment or by law to receive service of process or by serving the corporation by certified mail at any of its usual places of business or by serving an officer or agent of the corporation

Ala. R. Civ. P. 4(b).

> Service outside of this state under this rule shall include service by certified mail and delivery by a process server; and each method shall be deemed to confer in personam jurisdiction. Unless otherwise requested or permitted by these rules, service of process outside this state shall be made by certified mail.

Ala. R. Civ. P. 4.2(b).

> [6] Plaintiffs attempted to effect service in Kansas. Like Alabama, Kansas law on service

of process does not provide any broader rules for personal service or mail service than under the

Federal Rules:

> [S]ervice of process under this article shall be made as follows: ... (e) ... Upon a domestic or foreign corporation: (1) by serving an officer, manager, partner or a resident, managing or general agent, or (2) by leaving a copy of the summons and petition at any business office of the defendant with the person having charge thereof, or (3) by serving an agent authorized or required by law to receive process ....

K.S.A. 60-304.

**D.    Analysis**

1.    Service of Process

Novick argues that service was insufficient under federal law, Alabama law and Kansas law because Lehman was not an officer or authorized agent of Novick.  In response, Plaintiffs argue that Lehman's silence provides a basis upon which to find that he had authority to accept service.  Plaintiffs contend that Lehman was acting as outside counsel to Novick and, indeed, representing Novick in the present CERCLA lawsuit, during or around the time service was attempted.  Essentially, Plaintiffs contend that Novick should be estopped from asserting that service was insufficient because Lehman failed to inform the process server or Plaintiffs that he was not authorized to accept service.

The Court is not persuaded by Plaintiffs' argument.  In the Eleventh Circuit, "service of process is not effectual on an attorney solely by reason of his capacity as attorney.  Rule 4 ... allows service on an agent only if 'authorized by appointment or law to receive service of process.'"  *Ransom v. Brennan*, 437 F.2d 513, 518 (5th Cir. 1971) (citation omitted). [7]  Plaintiffs present no evidence that Lehman was authorized by appointment or law to receive service of process.  While "the authority of an attorney to accept service may be implied from the surrounding circumstances ...," courts do not

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

focus on the <u>attorney's</u> conduct, but instead determine whether the <u>principal</u> acted in such a manner as to indicate that it intends to authorize its attorney to accept service. *See J & L Parking Corp. v. United States*, 834 F. Supp. 99, 102 (S.D.N.Y. 1993), *aff'd without opinion*, 23 F.3d 397 (2d Cir. 1994).

The present case is similar to *J & L Parking Corporation v. United States*, a case relied upon by both parties. 834 F. Supp. 99. In *J & L Parking*, the plaintiff attempted to effectuate service on Columbia University by serving an outside attorney, Patricia Feldman, who had represented Columbia on a past matter involving the same plaintiff. *Id.* at 102. After Feldman informed the process server that she was not authorized to accept service of process, plaintiff never attempted to re-serve Columbia. *Id.*

In response to Columbia's challenge to service on Feldman, the court concluded that the plaintiff had failed to properly effectuate service on the University. *Id.* In reaching this conclusion, the court noted that an attorney's authority to accept service may be implied by circumstances "indicating the intent of the <u>client</u>." *Id.* (emphasis added) (citing *Olympus Corp. v. Dealer Sales and Service, Inc.*, 107 F.R.D. 300, 305 (E.D.N.Y. 1985)). There was no evidence, however, indicating that Columbia intended to authorize Feldman to accept service of process. *J & L Parking Corp*, 834 F. Supp. at 102. Rather, the evidence indicated the opposite; Feldman wrote on the process server's statement that she was not authorized to accept service. *Id.* In the present case, Plaintiffs have no evidence that Novick intended to authorize Lehman to accept service of process on behalf of Novick, just as J & L Parking had no evidence that Columbia intended to

authorize outside counsel to accept service on behalf of the University.

Plaintiffs argue that the present case is distinguishable from *J & L Parking*, however.  Plaintiffs point out that Feldman explicitly informed the process server that she was not authorized to accept service.  Conversely, in the instant case, Lehman did not inform the process server or Plaintiffs that he was not authorized to accept service.

Plaintiffs' argument is unpersuasive.  In reaching its decision that service was improper, the *J & L Parking* court focused on whether the principal's conduct showed that it intended to authorize outside counsel to accept service of process.  834 F. Supp. at 102.  This focus on the conduct of the principal is apparent by the *J & L Parking* court's citation to *Olympus Corporation v. Dealer Sales and Service, Incorporated*, 107 F.R.D. 300, 305 (S.D.N.Y. 1985).

In *Olympus Corporation* the plaintiff contacted an attorney who had represented the defendant corporation on related matters and informed the attorney of the soon-to-be filed complaint.  The attorney did not have authority to accept service on behalf of the corporation, but he informed the plaintiff that he would recommend to his client that it authorize him to accept service of process.  *Id.* at 305.  The client declined to do so, however, and challenged service after the plaintiff sent the complaint and summons to the attorney.

Finding that service on the attorney was invalid, the *Olympus Corporation* court noted that even if the attorney had informed the plaintiff that he was authorized to accept service, such information alone would have been insufficient to establish the attorney's

authority to accept service.  Rather, "there must be some evidence that the client intended to grant such authority."  *Id.*  (emphasis added).

Given the courts' focus, in *J & L Parking* and *Olympus Corporation*, on the representations of the principal or client, rather than the agent or attorney, no legal basis exists for arguing that Lehman's silence, alone, was sufficient to establish authority to accept service in the present case.  Further, Plaintiffs here point to no rule of professional responsibility that required Lehman to correct Plaintiffs' mistaken belief that he had authority to accept service.  In contrast, Plaintiffs were obligated to determine whether Lehman was authorized to accept service.  Yet, even after Charlene Kass informed the private party plaintiffs that Novick had not been served, Plaintiffs failed to verify whether or not they had properly effectuated service.  Accordingly, Plaintiffs must suffer the consequences of their inaction, not Novick.

Next, Plaintiffs argue that *J & L Parking* is distinguishable from the present case because the attorney in *J & L Parking* had represented Columbia in earlier litigation, not the litigation at the center of the service dispute.  Here, Plaintiffs contend that Lehman actually represented Novick in the present matter during the time service was attempted.  Plaintiffs ask this Court to allow them limited discovery for the purpose of firmly establishing such representation.  If, indeed, Lehman was representing Novick when service was attempted, Plaintiffs contend that Novick purposely avoided involvement in this litigation and the Court should not reward such purposeful avoidance.

Again, the Court is unpersuaded by Plaintiffs' argument.  Essentially, Plaintiffs

attempt to rely on Federal Rule 5(b)(1), even though that rule is not applicable.  Once the

complaint is properly served, Rule 5(b)(1) allows a plaintiff to serve all subsequent

pleadings on the attorney representing the defendant.  Fed. R. Civ. P. 5(b)(1) (service of

"every pleading subsequent to the original complaint" is to be served on the attorney

representing a party, unless the Court orders otherwise).   Inasmuch as the complaint was

never properly served in first place, Plaintiffs here were not free to serve Novick's

attorney.  Accordingly, conducting limited discovery would serve no useful purpose.

Even if Novick did retain Lehman to represent it in this CERCLA litigation, Plaintiffs

present no evidence that Novick attempted to <u>evade</u> service of process.  *See LSJ*

*Investment Co. v. O.L.D., Inc.*, 167 F.3d. 320, 322 (6th Cir. 1999).  This case is not like

*LSJ Investment Company v. O.L.D., Incorporated* where the defendant operated its

business at the location where service was made, but pretended the business operated

elsewhere in an effort to evade service of process.  *Id*.  In the absence of similar

maneuvering by Novick, voiding the default judgment in the present case does not serve

to reward defendants who engage in avoidance tactics.


    2.   <u>Timeliness</u>

Next, Plaintiffs argue that Novick's challenge to the default judgment is untimely.

Plaintiffs note that Lehman was aware of this CERCLA litigation before Plaintiffs served

the summons.  Additionally, Lehman was served with Plaintiffs' motion for entry of

default judgment in October 1999, (USA Doc. 275), and he was served with a copy of

this Court's default judgment in November 1999, (USA Doc. 315). However, Novick filed the current motion for relief on November 1, 2002, close to two years after this Court entered the default judgment. Because of this two-year lapse, Plaintiffs contend that defendants are estopped from arguing improper service and lack of personal jurisdiction.

In support of this argument, Plaintiffs rely on a recent Eleventh Circuit case: *Drill South Incorporated v. International Fidelity Insurance Company*, 234 F.3d 1232 (11th Cir. 2002). In *Drill South*, the Eleventh Circuit upheld service on a defendant corporation that waited two years to challenge service of process. *Id.* at 1238-39. The summons in *Drill South* properly named an officer of the defendant company, Enviro-Group, and was properly served upon the company at its corporate headquarters. The *Drill South* Plaintiffs also served Enviro-Group's surety company, International Fidelity. After plaintiff filed a motion for entry of a default judgment against Enviro-Group, the trial court repeatedly sought responses from the appearing defendants regarding plaintiff's motion. However, Enviro-Group's officer and surety company failed to object.

Upholding entry of the default judgment against Enviro-Group, the Eleventh Circuit found that the complaint and summons were properly served on the company's officer at the company's corporate headquarters. *Id.* at 1238-39. Plaintiff's failure to actually name Enviro-Group in the complaint was merely a "technical" defect because the company was fully aware that plaintiff was proceeding against Enviro-Group, as an entity, rather than against the individually named officer. *Id.* Indeed, the company had

effectively been involved throughout the course of litigation by way of the company's officer and surety. *Id*. Thus, when Enviro-group's officer and surety failed to object to the motion for entry of the default judgement, Enviro-group waived its right to challenge service. *Id*.

The facts in the instant case differ drastically from the facts in *Drill South*, where an officer of the defendant company was properly served and service was effectuated at the company's corporate headquarters. Here, on the other hand, the complaint and summons were never served on Novick, nor were they served on an officer or any individual who had authority to accept service of process. Thus, Plaintiffs' *Drill South* timeliness argument is without merit. Indeed, the Eleventh Circuit has noted that time may "touch" a defective decree, but time cannot give such decrees "vital force." *Hertz Corp. v. Alamo Rent-A-Car, Inc.*, 16 F.3d 1126, 1131 (11th Cir. 1994) (citation omitted).

Finally, while Novick clearly was aware of this CERCLA litigation, such knowledge does not prevent Novick from challenging service of process. As the former Fifth Circuit has explained, even where a defendant has received actual notice, such notice

> would not operate as a substitute for process. "Indeed, whenever a defendant comes into court to challenge the service of process he, of necessity, has received notice of the suit, but, clearly mere 'notice' is not sufficient ground upon which a court can sustain the validity of service of process when Congress has established other definitive standards."

*Ransom*, 437 F.2d at 519 (citation omitted).

## IV. HECK'S MOTION TO VACATE

### A.    Facts

On March 4, 1992, <u>more than six years before the present lawsuits were filed</u>, defendant Heck's Enterprises, Incorporated (Heck's) was organized under the laws of the State of North Carolina.  (USA Doc. 860, Hecimovich Aff. ¶ 2.)  Approximately one month after Heck's was organized, Michael E. Newton, who was the President and sole shareholder of Piedmont Battery Service, Incorporated ("Piedmont Battery"), sold his assets to Heck's.  (USA Doc. 861, Newton Aff. ¶ 2.)  In addition, Newton sold the Piedmont Battery trade name to Heck's and occupied the same building where Newton had operated his business.  (Hecimovich Aff. ¶ 4; Newton Aff. ¶ 2; Newton Aff. at Ex. B.)

On the date of the sale, Heck's filed, with the Probate Court in North Carolina, a "Certificate of Assumed Name" which identified Heck's as doing business as "Piedmont Battery Service." [8] (Hecimovich Aff. ¶ 5.)   However, both Newton and Heck's maintain that, except for a few limited accounts payable, Heck's did not assume any of Piedmont Battery's liabilities.  (Hecimovich Aff. ¶ 4;  Newton Aff. ¶ 2.)  All other liabilities remained with the former company until it was dissolved, more than one year after the business was sold.  (Newton Aff. ¶ 2; Newton Aff. at Ex. B;  Hecimovich Aff. at Ex. E.)  Even though Newton acted as a training consultant to Heck's, after the sale, Heck's

---

[8] This new company name differs sightly from the former company name, which was Piedmont Battery Service, <u>Incorporated</u>.

presents uncontradicted evidence that the two companies never had the same officers, directors, or shareholders. (*See* Hecimovich Aff. ¶ 3;  Hecimovich Aff. at Ex. B; Newton Aff. at 6.)

Approximately four months later, in November 1993, Newton received a notice of potential CERCLA liability from the United States Department of Justice and the United States Environmental Protection Agency.  He immediately responded to the government's correspondence by explaining that Piedmont Battery Service, Incorporated's assets had been sold and the company dissolved.  (Newton Aff. at Ex. B.)  Newton also advised the government of his new address because the prior correspondence had been sent to Piedmont's former address, which is the same location where Heck's now operates. (Newton Aff. ¶ 6; Hecimovich Aff. ¶ 11 .)  When mail for Newton arrived at Heck's, the company would either forward his mail or hold it unopened until it was picked up.  (*Id.*; Newton Aff. ¶ 6.)

When the United States initiated the present lawsuit, on October 8, 1998, six years after Piedmont Battery was sold, the USA named numerous defendants, including Piedmont Battery.  While the body of the complaint contained general allegations relating to all of the named defendants, none of the named defendants were specifically mentioned in the body of the complaint.  Heck's was not mentioned in either the caption or the body of the USA's complaint.  Newton never filed an answer in response to the USA's complaint.  (*See* Newton Aff. at Ex. C.)

When the private party plaintiffs filed their complaint, on November 18, 1998,

"Piedmont Battery Service, Inc. a/k/a Heck's Enterprises" was named as a defendant in

the caption and described in the body of the complaint as a person, within the meaning of

CERCLA.  However, the body of the complaint did not contain any specific information

about any of the defendants.  In response to their complaint, the private party plaintiffs

received a waiver of service form that was signed by Michael E. Newton on December

14, 1998:

> I agree to save the cost of service of summons and an additional copy of the
> complaint in this lawsuit by not requiring that entity on whose behalf I am
> acting be served with judicial process in the manner provided by Rule 4 of
> the Federal Rules of Civil Procedure.

(Heck's Mot. to Vacate at Ex. A) (emphasis added).   The waiver did not identify the

entity on whose behalf Newton was acting.  However, Heck's has presented

uncontradicted evidence that Newton was not authorized to accept service, nor was he an

employee, officer, shareholder or director of Heck's. (Hecimovich Aff. ¶ 10.)

The private party plaintiffs filed a motion to amend their complaint, on June 29,

1999, for the purpose of adding additional defendants and correcting the names of certain

defendants who were misidentified in the original complaint.  (USA Doc. 193.)  The

motion does not mention Heck's, nor was the motion served on Heck's.  Plaintiffs did,

however, serve a copy of the motion on "Piedmont Battery Service, Inc. a/k/a Heck's,"

addressed to Michael E. Newton. (*Id.*)

The following day, June 30, 1999, the USA and the private party plaintiffs sent a

letter to several defendants, including "Piedmont Battery Service, Inc.," indicating that

the defendants had not filed an answer in response to the two lawsuits. (Newton Aff. at

Ex. C.)  In the letter, Plaintiffs threatened to proceed with a default judgment against the

identified defendants if they failed to answer by July 15, 1999.  (*Id.*)  Newton responded

to Plaintiffs' correspondence by informing them that Piedmont Battery Service,

Incorporated had been dissolved. (Newton Aff. at Ex. D.)  Plaintiffs sent another letter to

Newton on July 7, 1999, regarding settlement of the lawsuits and requesting financial

information. (Newton Aff. at Ex. E.)  Newton responded with another letter explaining

that Piedmont Battery Service, Incorporated had ceased to exist and providing the

requested financial information, as it related to his then dissolved company.  (Newton

Aff. at Ex. H.)

On October 15, 1999, the private party plaintiffs again filed a motion to amend

their complaint to add additional parties and correct the name of defendants previously

misnamed.  (USA Doc. 274.)  The amended complaint was again served on Newton

addressed to "Piedmont Battery Service, Inc. a/k/a Heck's Enterprises, Inc."  (USA Doc.

280.)  Although the motion to amend was granted, Newton apparently did not respond to

the amended complaint.

On October 18, 1999, all of the plaintiffs filed a consolidated motion for entry of

judgment by default against a number of defendants, including "Piedmont Battery

Service, Inc. a/k/a Heck's Enterprises, Inc."  (USA Doc. 275.)  In supporting affidavits,

the attorneys for the governmental plaintiffs and the attorneys for the private party

plaintiffs indicated that service was made on "Piedmont Battery Service, Inc. a/k/a Heck's

Enterprises, Inc." using the waiver of service provisions found in Federal Rule 4.

Plaintiffs again addressed their documents to "Piedmont Battery Service, Inc. a/k/a

Heck's Enterprises, Inc., c/o Michael E. Newton."  (*Id.*)  This Court granted the motion,

on November 19, 1999, and entered a default judgment against  "Piedmont Battery

Service, Inc. a/k/a Heck's Enterprises, Inc." in the amount of $564,965.  (USA Doc. 315 )

The default judgment was domesticated in North Carolina approximately two years later,

in November 2001.

In addition to being the majority shareholder of Heck's and the Board Chairperson,

John R. Hecimovich is the company's registered agent for service of process.

(Hecimovich Aff. ¶ 2.)  According to Hecimovich, in September 2001, Plaintiffs sent a

notice to Newton explaining that Plaintiffs had filed this Court's default judgment in

North Carolina.  Martin R. Piecuch ("Piecuch"), a Heck's "employee," signed for the

notice. (Hecimovich Aff. ¶ 13; Hecimovich Aff. at Ex. G.)  Hecimovich claims that the

notice was not opened, but instead held for pick-up by Newton.  (Hecimovich Aff. ¶ 13.)

According to Hecimovich, several months later, his son accidentally opened a

letter addressed to "Piedmont Battery Service, Inc. c/o Registered Agent Michael E.

Newton," which contained a notice regarding domestication of the default judgment in

North Carolina. (Hecimovich Aff. ¶ 12; Hecimovich Aff. at Ex. F.)  The caption on the

notice lists "Piedmont Battery Service, Inc. a/k/a Heck's Enterprises, Inc." as the

defendant.  Hecimovich claims his son called the law firm that sent the notice and

informed one of the firm's attorneys that Piedmont Battery Service, Incorporated and

Heck's were not the same company. [9]  (Hecimovich Aff. ¶ 12.)

Sometime after November 28, 2001, Plaintiffs sent a notice regarding the North Carolina default judgment directly to Heck's, addressed to John R. Hecimovich as the registered agent.  (Hecimovich Aff. at Ex. G.)  According to Hecimovich, only then did Heck's became aware of the present litigation.  (Hecimovich Aff. ¶ 14.)  Indeed, Hecimovich maintains that he and Newton have never discussed the litigation. (Hecimovich Aff. ¶ 10.)

Currently, Heck's has entered a limited appearance asking that the Court, pursuant to Rule 60(b)(4) and (6), vacate the default judgment to the extent the judgment purports to be entered against Heck's Enterprises. [10]

---

[9]  The Court notes that Hecimovich's statements regarding the actions of his son and his employee, Piecuch, are subject to numerous challenges under the Federal Rules of Evidence. However, Hecimovich's statements relate to the circumstances surrounding notification of Heck's about domestication of the default judgment in North Carolina, not the circumstances surrounding the attempts at service on Heck's.  Accordingly, any evidentiary challenges to his statements may impact the domesticated default judgment, but such challenges would not defeat the company's current motion regarding service of process.

[10]  Federal Rule of Civil Procedure 60 provides, in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (4) the judgment is void; ... (6) any other reason justifying relief from the operation of the judgment.

**B.   Analysis**

1.   CERCLA Successor Liability

The private party plaintiffs first argue that service on Newton was proper because

Heck's is considered a successor company to Newton's company for purposes of

CERCLA liability.  Although CERCLA does not explicitly address successor liability,

Plaintiffs point out that many courts have found that successor companies cannot escape

CERCLA liability.  *See, e.g., North Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642 (7th

Cir. 1998); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1503 n.16

(11th Cir. 1996) (suggesting that successor liability is valid under CERCLA).

> CERCLA is a remedial measure which is aimed only at correcting
> environmentally dangerous conditions.  And holding the successor
> corporation liable for the cost of clean up is not necessarily unfair, since the
> successor and its shareholders likely will have derived some benefit from
> the predecessor's use of the pollutant and the savings that resulted form the
> hazardous disposal methods.

*North Shore Gas Co.*, 152 F.3d at 650 (citations omitted).  "[A]bsent successor liability, a

predecessor would benefit from the illegal disposal of hazardous substances and later

evade responsibility for remediation simply by changing the form in which it does

business, thereby subverting [CERCLA's] purpose of holding responsible parties liable

for clean up costs."  *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 519 (2d Cir. 1996) (citations

omitted).  Given the remedial nature of CERCLA, some courts have held that successor

liability may apply even if the successor corporation had no responsibility or knowledge

regarding the pollution.  *See Andritz Sprout-Baur, Inc. v. Beazer East, Inc.*, 12 F. Supp.2d

391, 405-06 (M.D. Pa. 1998).

When determining successor liability, the courts look at several factors to determine whether the purported successor merely purchased assets from the former company or whether the former company continues to exits through the successor company.  These factors include:

1)    retention of the same employees,

2)    retention of the same supervisory personnel,

3)    retention of the same production facility in the same location,

4)    production of the same product,

5)    retention of the same name,

6)    continuity of assets,

7)    continuity of general business operations, and

8)    the extent to which the successor holds itself out as the continuation of the previous enterprise.

*United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992).

Examining these factors, Plaintiffs point out that Heck's satisfies the CERCLA successorship test because Heck's took over the business operations of Piedmont, the trade name of Piedmont, the customer list that belonged to Piedmont, and the building that belonged to Piedmont.  (*See* Hecimovich Aff. at Exs. B & C.)  Additionally, Heck's hired Newton as a consultant.  (*See id*.)  In other words, Plaintiffs contend that Heck's continued to operate Piedmont Battery Service, Incorporated, albeit under a slightly

different name, in essentially the same form as had Newton. In response, Heck's notes that it specifically refrained from assuming the liabilities of Piedmont Battery Service, Incorporated. Therefore, Heck's merely engaged in an asset purchase, contends the company.

While Heck's appears to be a successor corporation for purposes of CERCLA, Plaintiffs do not direct this Court to any cases holding that successorship liability may be imposed without proper service on the purported successor. Likewise, Plaintiffs do not direct the Court to any cases holding that service of process on a dissolved company is sufficient to effectuate service on the successor company, when the person served was not the authorized agent of the successor company. Therefore, while Heck's may be liable for Piedmont Battery Service, Incorporated's purported environmental transgressions, no such liability may attach without proper service of process. In other words, the CERCLA successor analysis does not come into play until after service is properly made on the successor company.

> 2.    Service of Process

Heck's next argues that Plaintiffs never properly served it with process. Heck's contends that it did not waive service of process because the complaint and summons were not served on an individual authorized to accept service for Heck's. Moreover, Heck's points out that Newton informed the USA, in November 1993, six years before litigation was initiated, that Piedmont Battery Service, Incorporated had sold its assets

and the company had been dissolved.  (Newton Aff. at Ex. B.)  Newton then informed

both the USA and the private party plaintiffs about the dissolution when he received the

letter threatening default in July 1999.  Yet, to their detriment, both USA and the private

party plaintiffs failed to investigated the matter.

      Plaintiffs respond by arguing that Heck's was properly served because Michael

Newton signed and returned the waiver of service form without qualifying his signature

in a manner that might indicate he was only waiving service for Piedmont, not Heck's.  In

support of their argument that Newton's waiver constituted sufficient service on Heck's,

Plaintiffs rely on a Seventh Circuit Court of Appeals case: *Swaim v. Moltan Co.*, 73 F.3d

711, 721 (7th Cir. 1996).

      The present Court finds that *Swaim v. Moltan Company* is distinguishable from the

present case.  *Id.*  In *Swaim*, the Seventh Circuit Court of Appeals upheld service upon the

defendant because the company had engaged in a "contin[uing] effort to avoid service of

process and frustrate the efficient administration of justice."  *Id.* at 721.  The plaintiff in

*Swaim* first attempted to serve defendant Moltan Company by certified mail, return

receipt requested, addressed to the chief executive officer of Moltan at the company's

business address.  *Id.* at 715.  However, the postal service returned the documents

unclaimed.  Swaim then secured a private process server who attempted to deliver the

documents personally to Moltan's office.  When a secretary refused to accept the

complaint and summons, the process server left the documents at the secretary's feet, but

she mailed the papers back to the process server's office.  *Id.*  Swaim attempted to serve

the defendant a third time by delivering the documents to the Secretary of State in accordance with Indiana state law, which authorizes the Indiana Secretary of State to accept service of process for companies organized in that state. *Id.* The Secretary of State mailed the documents by certified mail, return receipt requested, to Moltan's business office, but the documents were returned unclaimed. *Id.* at 716. Upholding entry of the default judgment, the Seventh Circuit refused to allow Moltan to purposefully evade service when plaintiff had used three legitimate means to attempt service of process. *See id.* at 721, 716

By contrast, Plaintiffs here have provided no evidence that they served Heck's using means authorized by federal law.[11] Because Newton was not an officer, shareholder, or authorized agent of Heck's, his waiver of service did not attach to Heck's. As discussed above, without representations by the principal indicating that a purported agent is authorized to accept service, service is not valid on the purported agent. *See J & L Parking Corp. v. United States*, 834 F. Supp. 99, 102 (S.D.N.Y. 1993), *aff'd without opinion*, 23 F.3d 397 (2d Cir. 1994). The present case also differs from *Swaim* because Plaintiffs here have provided no evidence that Heck's avoided service or refused to accept service, as did the defendant in *Swaim*.

Next, Plaintiffs argue that service was proper because Heck's received actual notice of the lawsuits at its corporate headquarters. Plaintiffs point out that when Heck's

---

[11] None of the parties have addressed the requirements for service under North Carolina law.

received mail addressed to Newton, Heck's either held the mail until Newton picked it up or Heck's forwarded the mail to him.  Thus, Heck's received, at its business office, the complaint and summons in an envelope that was addressed to Newton with "Piedmont Battery, Inc. a/k/a Heck's Enterprises" printed on the front.  At the very least, contend the private party plaintiffs, Heck's had to be aware that it had receive a legal document. According to Plaintiffs, the United States Constitution simply requires that the private party plaintiffs inform Heck's that litigation is pending and provide Heck's with an opportunity to respond.

While this Court suspects that Heck's became aware of the pending litigation prior to domestication of the default judgment in North Carolina, the law demands more than notice and an opportunity to be heard.  Congress has imposed additional requirements regarding the form and manner of service and this Court is not at liberty to ignore these Congressional mandates.  Moreover, the Eleventh Circuit Court of Appeals has recognized that actual notice does "not operate as a substitute for process."  *Ransom v. Brennan*, 437 F.2d 513, 518 (5th Cir. 1971).  Accordingly, the private party plaintiffs are wrong when they contend "it is immaterial whether an authorized agent of Heck's or Piedmont Battery actually was served with process." (Pls.' Reply Br. at p. 4.) [12]

---

[12] In addition to echoing the CERCLA liability argument, the USA contends that proper service in the private party lawsuit means that service in the USA suit was valid.  The USA points out that the only difference between its service of the complaint and the private party service was the USA's failure to include the phrase "a/k/a Heck's Enterprises, Inc."  Because these cases have been consolidated, the USA contends that effective service in the private party action legitimizes service by the United States.

The USA's service of process argument is even less persuasive than the private party

3.     Waiver

Finally, the private party plaintiffs argue that Heck's has forfeited its right to contest the default judgment because Heck's failed to respond once the judgment had been domesticated in North Carolina.  Plaintiffs contend that, under North Carolina law, Heck's had thirty days to file an objection to entry of the default judgment in North Carolina.  Because Heck's failed to make a timely objection in North Carolina, Heck's cannot challenge the present Court's entry of the default judgment, argue Plaintiffs.

The Court notes that Hecimovich admits he became aware of the North Carolina default judgment around the time it was domesticated in November 2001, rather than in March 2002, when Heck's filed the present motion for relief.  (*See* Hecimovich Aff. ¶ 13.)  Thus, Hecimovich apparently could have filed a timely objection in North Carolina.  However, this Court is not the appropriate forum in which to resolve the timeliness issue.  Such an issue should be resolved by a North Carolina court.

## V. CONCLUSION

For the reasons explained above, the Court finds that the default judgments entered against Novick and Heck's are void because service of process was never properly

---

plaintiffs' argument.

effectuated on these two defendants.

Done this ____11th____ day of June, 2003.

Chief United States District Judge
U. W. Clemon